Filed 2/3/20; Certified for Partial Publication 2/26/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| GARY FORREST WILKIN, as Trustee, etc., <br><br>    Plaintiff and Appellant, <br><br> v. <br><br> WILLIAM NELSON, <br><br>    Defendant and Respondent. | 2d Civ. No. B294530 <br> (Super. Ct. No. 16PR00234) <br> (Santa Barbara County) |

William and Hanako Nelson were married in 1981.[1]  In 2000, Hanako executed a trust leaving a separate property rental home to Gary and Jay Wilkin, her adult sons from a prior marriage.  At that time, Hanako also executed a pour-over will granting "the residue of [her] estate" to the trustee for administration after her death.  Hanako did not advise William

---

[1] For convenience and clarity, we refer to the various family members by their first names.

of her estate plan, but he later discovered she had placed her rental home into a trust for the benefit of her sons.

Hanako died in 2016. Gary, who became the successor trustee, filed a probate petition requesting that Hanako's separate and community property assets be transferred to her trust. He claimed the pour-over will required that all of her real and personal property be declared trust assets.

William filed a petition seeking reformation of the pour-over will to confirm Hanako's intent to transfer only the residue of her separate property estate into the trust. He cited *Estate of Duke* (2015) 61 Cal.4th 871 (*Duke*), which held that "an unambiguous will may be reformed to conform to the testator's intent if clear and convincing evidence establishes that the will contains a mistake in the testator's expression of intent at the time the will was drafted, and also establishes the testator's actual specific intent at the time the will was drafted." (*Id.* at p. 898.)

Following a three-day evidentiary hearing, the probate court found that clear and convincing evidence supported equitable reformation of the will to provide for testamentary control and disposition of Hanako's separate property only. The court denied Gary's requests under Family Code section 1101[2] for a community property award against William and ordered Gary to reimburse William for the attorney fees incurred to expunge the lis pendens on one of William's properties. Gary appeals each of these rulings.

_____

[2] All statutory references are to the Family Code unless otherwise stated.

We dismiss the appeal from the attorney fees award because the order granting those fees is nonappealable.[3] (See Code Civ. Proc., §§ 405.38, 405.39.) In all other respects, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

William and Hanako each brought a separate property residence into the marriage. Hanako owned rental property located at 6155 Covington Way in Goleta (Goleta property). William had a residence in Castro Valley. Hanako and William, who were married for 34 years, had no prenuptial agreements or joint estate plans.

William has five adult children from a prior marriage, plus numerous grandchildren and great-grandchildren. Hanako and her sons, Gary and Jay, enjoyed a close relationship with William's extended family. They spent holidays together and went on many trips, including a Hawaiian cruise arranged by Hanako.

In 2000, Hanako retained Stephen McKee, a certified specialist in trust estates and probate law, to prepare a trust. Hanako was friends with McKee's sister, Mary (Mimi) Warga, who also is one of McKee's legal assistants. McKee has a law office in Northern California, but spends most of his time in his Southern California office. Warga "was the primary contact for living trusts in the Northern California office."

Jay, who assisted his mother in obtaining the trust, told Warga that Hanako wanted "just trust for home" and was given a

---

[3] The appealability of the order awarding attorney fees under Code of Civil Procedure section 405.38 was not briefed by the parties. At our request, the parties submitted supplemental letter briefing on this issue.

3

quote of $600. Jay's handwritten notes on McKee's standard intake questionnaire listed the Goleta property as the only asset to be controlled by Hanako's estate plan. Jay wrote: "Since remarriage, the aforementioned real estate is to be willed to Gary and Jay Wilkin. Father's wishes."

On March 28, 2000, Hanako and Jay met with Warga at her office to confirm and clarify Hanako's testamentary request for "just trust for home." Jay assisted Hanako in describing her intent, which was to leave the Goleta property to her sons equally. The meeting lasted approximately an hour.

According to Warga, Hanako did not request the preparation of any instruments other than the trust and a grant deed transferring the Goleta property into the trust. Warga testified there was no discussion regarding community property or a possible will and noted that the section of the questionnaire designating the proposed executor of the will was left blank. Jay testified, however, that Warga brought up the issue of a pour-over will and that Hanako agreed to purchase one. Jay paid for McKee's legal services with a $600 check. The memo line of the check contains the handwritten word "trust."

Jay testified that Warga told him what to write on the intake questionnaire, which lists only the Goleta property. In response to the question asking whether Hanako considered all her property to be community property, she answered "[n]o." The portions of the questionnaire seeking information about bank accounts, investments, retirement benefit plans, life insurance and any safe deposit boxes were either left blank or marked "N/A" (i.e., not applicable). The proposed successor trustees to Hanako's trust were listed on the form, but there were no proposed executors of a will. Warga explained that if the will had

4

been discussed, the section regarding the executors would have been completed.

Page 7 of the questionnaire asks about "[d]istribution of balance of property (residue) in estate." This section was marked inapplicable, but Warga recalled Hanako raising the possibility of future joint estate planning with her husband which would involve "the rest of [Hanako's] property."

Warga sent the intake questionnaire to McKee, who then had a single phone call with Hanako. The only asset they discussed was the Goleta property. There was no conversation regarding the couple's community property, bank accounts or investments. McKee believed Hanako's sole testamentary intent was to place the Goleta property into a trust. Although he did not discuss this with Hanako, McKee's general practice is to prepare a pour-over will with any trust.

McKee and his Southern California staff prepared the estate planning documents and sent them to Warga. On May 3, 2000, Hanako met with Warga at Hanako's home to execute the trust and grant deed. The first page of the trust states: "The property transferred is the settlor's separate property and shall be known as the 'separate trust estate.'" Warga also provided Hanako with a pour-over will, which states in Article 2: "Residue – Pour-Over to Living Trust, to Descendants: I give the residue of my estate to the trustee of the trust identified below, terms the 'pour-over beneficiary,' to be held and administered by the trustee according to the terms and conditions of that trust." This was the first time Hanako had seen the documents.

Hanako signed all three documents, but did not read the pour-over will. Warga notarized the trust and deed and served as a subscribing witness to the will. Warga also brought another

witness to sign the will. Warga explained to Hanako that the will "would cover any assets in her case, separate property assets, . . . that were only in her name" and "that [those] would be left to the trust." Once again, there was no discussion regarding any community property assets.

Warga mailed the original trust and pour-over will to Jay. Hanako never saw the will again. William did not learn of its existence until after Hanako's death.

In 2009, Hanako asked McKee to prepare a first amendment to the trust. That instrument nominated Gary as the new first successor trustee and moved Jay into second position. It also disinherited Jay from the trust, assuming Gary and his issue survived Jay. Jay had been experiencing substantial financial difficulties and Hanako wished to protect the Goleta property from any creditors. The pour-over will was not discussed, amended or republished.

Previously, in 2007, William and Hanako's friend, Evelyn Moore, granted them a 50% interest in her San Leandro real property. That property was later sold and William and Hanako received half of the sale proceeds. Hanako spent her share on a Hawaiian cruise for 38 members of their extended families.

In 2012, William and his daughter, Mary Smith, jointly purchased a condominium in Maui. They each paid approximately half of the $100,000 purchase price. William's half came from the San Leandro property sale proceeds. Hanako approved of the purchase, which was intended to be a family vacation home.

Hanako subsequently developed dementia. In 2014, William engaged an estate planning attorney, Steven Dimick, to prepare a trust for the couple. Hanako went with William to the

appointment, but Dimick said he could not do a trust for her because of her dementia. He advised William to get his own trust.

William designated Hanako as the primary beneficiary in his trust, with the residue going to his children upon her death. Based upon Dimick's advice, William funded the trust with $137,233.68 from the couple's joint accounts, leaving the accounts with a $168,658.67 balance. Most of that money was generated by William's employment and retirement accounts. William also transferred the Castro Valley residence and the Maui property into the trust.[4]

After Hanako's death, Gary filed a probate petition seeking to confirm the validity of Hanako's trust, the Goleta property's status as a trust asset and Gary's entitlement to all rents from that asset. He also sought a determination that Hanako's remaining assets, whether community or separate property, were transferred to the trust through the pour-over will.

William opposed Gary's petition and filed his own petition seeking to invalidate Hanako's trust as to any community property assets, to reform the pour-over will to include only Hanako's separate property and to determine that the Goleta property was a community asset. Gary opposed that petition, claiming William had breached his fiduciary duties under

---

[4] The probate court found that William "brought his Castro Valley residence into [the] marriage with Hanako, and at no time did Hanako express an intent to exert testamentary control over this real property." The court later confirmed the residence "as community property, with Hanako's interest passing to [William] at her death."

7

sections 721 and 1101 and Probate Code section 859. William later withdrew his claim as to the Goleta property.

Following the evidentiary hearing, the probate court issued its findings and order for judgment. The court found "on the issue of equitable reformation of [Hanako's] pour-over will [the evidence] satisfies the clear and convincing burden of proof" and ordered "that the residue clause of the will is equitably reformed and limited to apply only to disposition of [Hanako's] separate property." That property included Hanako's jewelry, 200 shares of PG&E stock, the master bedroom furniture and the Goleta property rent monies deposited in a Wells Fargo account. The court ordered William to return to Hanako's trust the $17,000 he had withdrawn from that account after her death. It also confirmed the Goleta property as Hanako's separate property.

The probate court determined the couple's community property assets belong to William as the surviving spouse, and concluded that the Maui property is his separate property because it was purchased with his inheritance from Moore. It rejected Gary's section 1101 claims regarding William's division of the couple's joint accounts. The court found that Gary lacked standing to pursue those claims and that they also are not supported by the evidence.

Finally, the probate court granted William's motion to expunge the lis pendens on the Castro Valley residence and awarded him $4,500 in attorney fees pursuant to Code of Civil Procedure section 405.38. The court denied Gary's requests for attorney fees.

8

## II. DISCUSSION

### A. *Equitable Reformation of the Pour-Over Will*

Applying the clear and convincing evidence standard, the probate court found the residue clause in the pour-over will contains a mistake in Hanako's expression of intent at the time the will was drafted and must be reformed to reflect her actual specific intent. The court concluded: "On the dispositive issue of Hanako's intent, the evidence shows that Hanako had a simple and direct intent – she wanted 'Just Trust for Home.' The reasonable conclusion is that Hanako did not intend to fund her separate property trust with community property. The Residue Clause of Hanako's Pour-Over Will is to be interpreted to comport with her express instructions and intent given to her estate planning attorney and his legal assistant for a trust for her separate property, not the Nelson community property." Gary contends substantial evidence does not support the court's findings. We disagree.

### 1. *Standard of Review*

The interpretation of a will presents a question of law for our independent review when there is no conflict or question of credibility in the relevant extrinsic evidence. (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604; *Burch v. George* (1994) 7 Cal.4th 246, 254, superseded by statute on other grounds as stated in *Estate of Rossi* (2006) 138 Cal.App.4th 1325, 1331-1332, 1339.) To the extent the probate court's decision rests on its findings of fact, however, those findings are reviewed for substantial evidence. (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750; *Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 87 (*Ike*).) The clear and convincing standard, however, "applies only at the trial level. On appeal, it is assumed that the trial court applied the proper

9

standard and the judgment will not be upset if there is substantial evidence to support it." (*Shupe v. Nelson* (1967) 254 Cal.App.2d 693, 700; see *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881.) The parties agree the substantial evidence standard applies here. Under this standard, we "accept[] the evidence most favorable to the order as true and discard[] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 595.)

A trial court's exercise of its equitable powers is reviewed for abuse of discretion. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1256; *In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1272.) Reformation of a will involves the exercise of the court's equitable powers. (*Giammarrusco v. Simon* (2009) 171 Cal.App.4th 1586, 1603; *Ike, supra,* 61 Cal.App.4th at p. 84.)

### *2. Substantial Evidence Supports the Probate Court's Findings of Hanako's Intent and the Mistake in Drafting the Pour-Over Will*

The testator in *Duke* executed a holographic will devising his entire estate to his wife. The will stated that if the couple died at the same time, the estate would be divided between two charities. The will did not provide for disposition of the estate if the wife predeceased the testator, which she did. The testator's intestate heirs and the charities both claimed the estate. (*Duke, supra,* 61 Cal.4th at p. 876.) The charities asserted that "at the time the testator wrote his will, he specifically intended to provide in his will that the charities would inherit his estate in the event his wife was not alive when he died." (*Id.* at p. 875.)

10

Because the will was unambiguous, the trial court excluded extrinsic evidence of the testator's intent and ruled in favor of the intestate heirs. (*Duke*, *supra*, 61 Cal.4th at p. 877.) The Supreme Court reexamined and rejected the historic rule precluding the use of extrinsic evidence to correct a mistake in the expression of a testator's intent in an unambiguous will. (*Id.* at p. 879.) It concluded that "[i]n cases in which clear and convincing evidence establishes both a mistake in the drafting of the will and the testator's actual and specific intent at the time the will was drafted, it is plain that denying reformation would defeat the testator's intent and result in unjust enrichment of unintended beneficiaries." (*Id.* at p. 890 ["[T]he paramount consideration in construing a will is to determine the subjective intent of the testator"]; see *Placencia v. Strazicich* (2019) 42 Cal.App.5th 730, 741 ["[T]he modern trend [is] toward favoring the decedent's intent over formalities"].)

Gary argues *Duke* does not apply here because the devise in the pour-over will is general and not specific. A specific devise is a "transfer of specifically identifiable property" (Prob. Code, § 21117, subd. (a)), while a general devise "is a transfer from the general assets of the transferor that does not give specific property." (*Id.*, subd. (b); see Ross & Cohen, Cal. Practice Guide: Probate (The Rutter Group 2019) ¶ 16:532, p. 16-182 [explaining the difference between specific and general devises].) The flaw in Gary's argument is that the will in *Duke* "left all of [the testator's] property" to his wife, which is a general devise. (*Duke*, *supra*, 61 Cal.4th at p. 876; Prob. Code, § 21117, subd. (b).) There is no suggestion the Supreme Court intended to limit its holding to specific devises. (See *Duke*, at p. 898.)

11

Applying *Duke's* two-prong standard, we conclude substantial evidence supports the probate court's decision to equitably reform the pour-over will. Specifically, there is substantial evidence of Hanako's actual and specific intent at the time the trust and will were drafted. It is undisputed she wanted a trust to gift her separate property rental home, i.e., the Goleta property, to her two sons, and that she also "expressed some general desire to have a will to control the disposition . . . of her separate property." The will as drafted contains a mistake in the expression of that intent. (See *Duke, supra*, 61 Cal.4th at pp. 890, 898.)

"The [drafting] attorney's testimony, although not conclusive, is entitled to much weight." (*Estate of Goetz* (1967) 253 Cal.App.2d 107, 114.) McKee testified it is fair to state that Hanako's trust is a separate property trust. The instrument provides that "[t]he property transferred is the settlor's separate property and shall be known as the 'separate trust estate.'" During his deposition, McKee confirmed the trust did not include any community assets. He also acknowledged that he and Hanako did not discuss the pour-over will or her community property assets during their phone call.

Warga corroborated McKee's testimony. She testified that Hanako's exclusive intent when she signed the trust was to leave the Goleta property to her sons. Warga explained to Hanako the effect the trust and pour-over will would have on her separate property assets, but there was no discussion regarding her community property assets. To the contrary, Warga and Hanako discussed the possibility of a joint estate plan with William, which would take care of "[t]he rest of her property."

12

In addition, Hanako's simultaneous execution of the trust, the pour-over will and the grant deed transferring the Goleta property, as her separate property, into the trust further evidences her intent to control only her separate property through the estate plan. (See *Estate of O'Connell* (1972) 29 Cal.App.3d 526, 531-532 ["Once the testamentary scheme or general intention [of a trust or will] is discovered, the meaning of particular words and phrases is to be subordinated to this scheme, plan or dominant purpose"]; *Estate of Goyette* (2004) 123 Cal.App.4th 67, 73 [same].)

Carl Tucker Cheadle, an expert on the attorney standard of care in drafting estate planning instruments, testified that Hanako's trust is a separate property trust and, as such, should only hold separate property assets. He opined that if Hanako's intent was to transfer community property assets into the trust, the trust should have been amended to permit that transfer. He also agreed with the probate court that Gary's interpretation of Hanako's estate plan is illogical because the purpose of having a trust is to bypass probate. Jay testified that Hanako wanted to avoid a probate proceeding. At the time of Hanako's death, however, a pour-over will was exempt from probate only if the value of the assets totaled less than $150,000. (Former Prob. Code, § 13100.) Hanako's share of the community estate was significantly more than that. As the probate court aptly noted, "if it was your intention to have property passed by a nonprobate mechanism, you wouldn't depend on the probate of a will to transfer the properties there."

Moreover, Jay testified that at the time of the March 28, 2000 meeting with Hanako and Warga, he did not understand that Hanako's portion of the community property would go into

13

the will.  It is evident that Hanako also had no such understanding, to the extent a will was even discussed at that meeting.  As the probate court observed, it is unclear whether Hanako knew she had any community property assets, let alone whether she intended to gift those assets through the trust and pour-over will.  William testified that he and Hanako never discussed the concept of community property, and neither McKee nor Warga explained that concept to her.  Jay and Gary also "testified (against their own interests) that Hanako never even used the term 'community property' in discussing her estate plans or testamentary intent before, during, or after the execution of the 2000 estate plans."  The court noted that Hanako "was treated badly by those who should have advised her in the process" and that "had they respected her intelligence and ability to understand, . . . they would have discussed these things with her."

In the absence of any evidence showing Hanako's intent to include community property assets in her estate plan, it was reasonable for the probate court to interpret the evidence of her intent as it did.  (See, e.g., *Multani v. Knight* (2018) 23 Cal.App.5th 837, 857.)  Where, as here, there is "a mistake in expression [of] the testator's actual and specific intent at the time the will was drafted," the will should be reformed to express that actual intent.  (*Duke, supra*, 61 Cal.4th at p. 896.)  It is true that "[p]reference is to be given to an interpretation of an instrument that will prevent intestacy" (Prob. Code, § 21120), but "no policy underlying the statute of wills supports a rule that would ignore the testator's intent and unjustly enrich those who would inherit as a result of a mistake."  (*Duke,* at p. 896.)

### 3.  *The Probate Court Did Not Abuse Its Discretion In Reforming the Pour-Over Will*

Given the probate court's finding that Hanako intended at the time the trust and pour-over will were drafted to provide for testamentary control and disposition of only her separate property, the decision to reform the pour-over will to conform to that actual and specific intent was well within the court's discretion.  (See *Duke, supra*, 61 Cal.4th at pp. 890, 898.)  Gary has not demonstrated an abuse of that discretion.

### B.  *Breach of Fiduciary Duty Claims*

Section 1101 provides remedies when a spouse's breach of fiduciary duty "results in impairment to the [other] spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused . . . a detrimental impact to the [other] spouse's undivided one-half interest in the community estate."  (*Id.*, subd. (a).)  Gary maintains that any community property improperly transferred to William's trust, including the $137,233.68 from the couple's joint accounts, is part of Hanako's estate and must be returned under section 1101, subdivisions (g) and (h).

The probate court determined Gary's section 1101 claims are procedurally and substantively improper.  We need not discuss all of the court's reasons for that ruling because we find two dispositive.  First, the court found that Gary lacks standing to pursue his section 1101 claims.  Gary asserts those claims in his capacity as the successor trustee of Hanako's separate property trust, and Jay, not Gary, is the executor/personal representative named in Hanako's pour-over will.  The will was never admitted to probate and, consequently, "Gary has not

15

obtained standing by a court order to prosecute the [section] 1101 claim as his mother's personal representative, to the extent that Hanako may have had such [a] claim against [William]." The court recognized that "while Gary could acquire standing to assert a . . . section 1101 cause of action against [William], *Gary did not acquire standing to proceed on this claim on behalf of his deceased mother.*" (Italics added.)

William contends, and we agree, Gary has waived any challenge to the probate court's ruling on standing by failing to raise the issue in his opening brief. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 ["Courts will ordinarily treat the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge"]; *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7 ["Issues not raised in the appellant's opening brief are deemed waived or abandoned"].) Gary devotes five pages to the standing issue in his reply brief, but it is settled that "[p]oints raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. To withhold a point until the closing brief deprives the respondent of the opportunity to answer it or requires the effort and delay of an additional brief by permission." (*Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 (*Campos*); *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 573, fn. 18 ["[A]ppellant cannot salvage a forfeited argument by belatedly addressing the argument in its reply brief"].)

Gary has not provided a "good reason" for waiting until the reply brief to discuss the probate court's potentially dispositive ruling regarding his standing to prosecute the section 1101 claims. (*Campos, supra,* 57 Cal.App.4th at p. 794, fn. 3.) Gary's

16

admission that he "did not respond in detail to the standing ruling in the Opening Brief" is misleading. An electronic search of that 68-page brief confirms the word "standing" was never mentioned. We are not persuaded by Gary's conclusory statement that he did not waive his response to this issue.

In any event, substantial evidence supports the probate court's finding, pursuant to section 1101, subdivision (a), that William's "withdrawal of one-half of the monies on deposit in the Nelson joint accounts did not cause a 'detrimental impact to [Hanako's] present undivided one-half interest in the community estate'." As the probate court explained: "Had the Court rejected [William's] Petition for equitable reformation of Hanako's Pour-Over Will, the community property funds on deposit in [William's] trust would have been recoverable to Hanako's Trust under the Residue Clause in her Pour-Over Will. Per [section] 751, Gary would have a claim to one-half of the community, which would be the amount of $68,616.84 (representing one-half of the community held in accounts in [William's] individual trust)."

But Gary has no such claim because the probate court did equitably reform the pour-over will to include only Hanako's separate property – a decision we are upholding. As a result, Hanako died intestate with respect to her community property assets. Under Probate Code sections 100 and 6401, Hanako's interest in those assets passed to William as the surviving spouse.[5] Any prior actions taken by William with respect to those assets are irrelevant because he is legally entitled to them.

---

[5] Probate Code section 100, subdivision (a) provides: "Upon the death of a person who is married or in a registered domestic partnership, one-half of the community property belongs to the

17

Gary also challenges the probate court's finding that the Maui property is William's separate property.  Once again, whether or not the property is a community asset is immaterial.  William inherited Hanako's share of their community property, and thus the Maui property belongs to him regardless of its character.  The same is true of the Castro Valley property.  The court determined that property is a community asset and, as such, Hanako's share passed to William upon her death.  (See Prob. Code, §§ 100, subd. (a), 6401, subd. (a).)

*C. Award of Attorney Fees on Expungement Motion*

Code of Civil Procedure section 405.38 entitles the prevailing party on a motion to expunge a lis pendens to "reasonable attorney[] fees and costs of making or opposing the motion unless the court finds that the other party acted with substantial justification or that other circumstances make the imposition of attorney[] fees and costs unjust."  Gary appeals the probate court's order requiring him to pay $4,500 in attorney fees incurred by William in successfully moving for expungement.

Code of Civil Procedure section 405.39 provides that "[n]o order . . . under this chapter [Code Civ. Proc., § 405.30 et seq.] shall be appealable.  Any party aggrieved by an order made on a motion under this chapter may petition the proper reviewing court to review the order by writ of mandate."  (See *Woodridge Escondido Property Owners Assn. v. Nielsen* (2005) 130

surviving spouse and the other one-half belongs to the decedent."  Probate Code section 6401, subdivision (a) states:  "As to community property, the intestate share of the surviving spouse is the one-half of the community property that belongs to the decedent under Section 100."

18

Cal.App.4th 559, 577; *Sixells, LLC v. Cannery Business Park* (2008) 170 Cal.App.4th 648, 652, fn. 3.)

After the probate court granted William's motion, Gary filed a timely writ petition, acknowledging that "an order to expunge a lis pendens is only properly reviewable by Petition for Writ of Mandate." He did not, however, raise the issue of the attorney fees. We denied the petition.

Code of Civil Procedure section 405.39 governs the procedure for seeking review of an order granting a motion to expunge and awarding attorney fees under Code of Civil Procedure section 405.38. Gary's writ petition did not challenge those fees and we lack jurisdiction to consider the issue on appeal. (*Id.*, § 405.39.) We are not persuaded by Gary's arguments to the contrary.

## III.  DISPOSITION

The appeal from the order awarding attorney fees to William with respect to his motion to expunge the lis pendens is dismissed. In all other respects, the probate court's findings and order for judgment are affirmed. William shall recover his costs on appeal.



PERREN, J.

We concur:


GILBERT, P. J.          TANGEMAN, J.


19

Jed Beebe, Judge
Superior Court County of Santa Barbara

_____

M. Jude Egan, for Plaintiff and Appellant.

Hoge, Fenton, Jones & Appel, Denise E. Chambliss, for Defendant and Respondent.

Filed 2/26/20

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| GARY FORREST WILKIN, as Trustee, etc.,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>WILLIAM NELSON,<br><br>  Defendant and Respondent. | 2d Civ. No. B294530<br>(Super. Ct. No. 16PR00234)<br>(Santa Barbara County)<br><br><br>ORDER CERTIFYING OPINION<br>FOR PARTIAL PUBLICATION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter, filed on February 3, 2020, was not certified for publication in the Official Reports. For good cause, it now appears the opinion should be partially published in the Official Reports. The portions to be excluded from publication are Section II(B), entitled "Breach of Fiduciary Duty Claims," and Section II(C), entitled "Award of Attorney Fees on Expungement Motion." It is so ordered.

There is no change in judgment.